**SCHEDULED FOR ORAL ARGUMENT ON OCTOBER 26, 2021**

No. 19-7098

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

MARY E. CHAMBERS,
*Plaintiff-Appellant,*

v.

DISTRICT OF COLUMBIA,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the District of Columbia

---

**EN BANC BRIEF OF
COURT-APPOINTED AMICUS CURIAE**

---

Zachary C. Schauf
Laurel A. Raymond
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Phone: (202) 639-6000
Fax: (202) 639-6066
zschauf@jenner.com

*Court-Appointed Amicus Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. *Parties and amici.*—The plaintiff below and appellant here is Mary E. Chambers.  The defendant below and appellee here is the District of Columbia. The United States, the Metropolitan Washington Employment Lawyers Association, and the Constitutional Accountability Center have submitted briefs as amici curiae for appellant.  *Amicus* Zachary C. Schauf was appointed by the Court.

B. Ruling under review.—Chambers appeals from the district court's July 24, 2019 order (Walton, J.) granting the District's motion for summary judgment (ECF Nos. 61, 62).

C. Related cases.—On May 28, 2021, this Court issued an order holding *Townsend v. United States*, No. 19-5259, in abeyance pending disposition of this appeal.

Dated: August 27, 2021

/s/ Zachary C. Schauf
Zachary C. Schauf

Court-Appointed Amicus

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........................................................................................ i

TABLE OF AUTHORITIES ................................................................ iv

GLOSSARY ....................................................................................... xii

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 5

STATEMENT OF THE ISSUE ........................................................... 5

STATUTES AND REGULATIONS ..................................................... 6

STATEMENT OF THE CASE ............................................................. 6

    A.    Title VII's Substantive Prohibitions On Discrimination ........ 6

    B.    *Brown's* Requirement Of Material, Objective Harm .............. 7

    C.    This Case ..................................................................... 11

    D.    *En Banc* Review .......................................................... 13

STANDARD OF REVIEW ................................................................ 14

SUMMARY OF ARGUMENT ........................................................... 15

ARGUMENT ................................................................................... 16

I.    Overruling *Brown* Will Undermine The Values *Stare Decisis* Protects ....................................................................... 16

II.    *Brown's* Rule Accords With Title VII's Text, The Supreme Court's Authoritative Decisions, And Title VII's Purposes ........... 24

    A.    In Title VII, The Phrase "Otherwise Discriminate Against" Means To Inflict Material, Objective Harm. ......... 25

1.   *Brown* Accords With Title VII's Text And The Supreme Court's Precedent Interpreting That Text ....................................................................... 25

2.   *Brown* Balances Title VII's Competing Purposes In Just The Way The Supreme Court Has Directed ........ 33

3.   The Contrary Arguments Lack Merit .......................... 39

B.   The Phrase "With Respect To … Compensation, Terms, Conditions, Or Privileges Of Employment" Does Not Help Chambers And Her *Amici*. ........................................... 45

1.   The Phrase "With Respect To" Makes Clear That A Plaintiff Must Suffer A Harmful Change To A Term, Condition, Or Privilege Of Employment. ......... 45

2.   The Phrase "Terms, Conditions, Or Privileges Of Employment" Does Not Encompass Purely Lateral Transfer Decisions. ...................................................... 46

C.   Legislative History Does Not Support Chambers. .............. 54

D.   The History Of Congressional Action Does Not Support Chambers. ................................................................. 57

E.   Chambers' Administrability Arguments Are Meritless ....... 59

III.   The Court At Minimum Should Retain *Brown* In *McDonnell Douglas* Cases ................................................................. 61

IV.   The Court Should Not Address Chambers' Anti-Retaliation Arguments ........................................................................ 62

CONCLUSION .................................................................................. 63

CERTIFICATE OF COMPLIANCE ................................................ 64

CERTIFICATE OF SERVICE .......................................................... 65

# TABLE OF AUTHORITIES[*]

CASES

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) .............................. 34

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974) ....................... 1, 6

*Aquino v. Honda of America, Inc.*, 158 F. App'x 667 (6th Cir. 2005) ................................................................................................ 22

*Babb v. Wilkie*, 140 S. Ct. 1168 (2020) ................................................... 31

*Bangerter v. Orem City Corp.*, 46 F.3d 1491 (10th Cir. 1995) .............. 23

*Bing v. Roadway Express, Inc.*, 444 F.2d 687 (5th Cir. 1971) ............... 58

*Bing v. Roadway Express, Inc.*, 485 F.2d 441 (5th Cir. 1973) ............... 58

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) .......... 3, 15, 26, 33, 46

*Bristow v. Daily Press, Inc.*, 770 F.2d 1251 (4th Cir. 1985) ................... 19

*Broderick v. Donaldson*, 437 F.3d 1226 (D.C. Cir. 2006) ....................... 11

*\*Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999) ......... 1, 6, 7, 8, 9, 19, 24, 35, 36, 43, 44, 51

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) ................... 43

*\*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006) .................................................... 3, 4, 15, 26, 32, 33, 34, 35, 37, 39, 41, 43, 44, 46

*California Federal Savings & Loan Ass'n v. Guerra*, 479 U.S. 272 (1987) ......................................................................................... 23

*Chuang v. University of California Davis*, 225 F.3d 1115 (9th Cir. 2000) ......................................................................................... 18

---

[*] Authorities chiefly relied upon are marked with an asterisk.

iv

*Connell v. Bank of Boston*, 924 F.2d 1169 (1st Cir. 1991) ...................... 19

*Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871 (D.C. Cir. 1992) ........................... 17, 18, 20

*CTS Corp. v. Waldburger*, 573 U.S. 1 (2014) .......................................... 40

*Currier v. Postmaster General*, 304 F.3d 87 (D.C. Cir. 2002) .......... 11, 38

*Czekalski v. LaHood*, 589 F.3d 449 (D.C. Cir. 2009) ................................ 9

*Czekalski v. Peters*, 475 F.3d 360 (D.C. Cir. 2007) .......................... 10, 36

*Doe v. Dekalb County School District*, 145 F.3d 1441 (11th Cir. 1998) ............................................................................................ 18

*Douglas v. Donovan*, 559 F.3d 549 (D.C. Cir. 2009) .............................. 41

*Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ............................. 30

*Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203 (1964) ............................................................................................... 52

*Flaherty v. Gas Research Institute*, 31 F.3d 451 (7th Cir. 1994) ............................................................................................... 18

*Fogg v. Ashcroft*, 254 F.3d 103 (D.C. Cir. 2001) .................................... 14

*Forkkio v. Powell*, 306 F.3d 1127 (D.C. Cir. 2002) ....................... 7, 10, 36

*Fort Stewart Schools v. Federal Labor Relations Authority*, 495 U.S. 641 (1990) ..................................................................... 47, 48

*Franks v. Bowman Transportation Co.*, 424 U.S. 747 (1976) ............... 34

*Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840 (D.C. Cir. 2001) ......................................................................... 9, 35

*Furnco Construction Corp. v. Waters*, 438 U.S. 567 (1978) .................. 39

*Geleta v. Gray*, 645 F.3d 408 (D.C. Cir. 2011) ....................................... 10

*Ginger v. District of Columbia*, 527 F.3d 1340 (D.C. Cir. 2008) ........................................................................... 9, 35

*Griffith v. City of Des Moines*, 387 F.3d 733 (8th Cir. 2004) ................ 22

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) .................................... 23

*Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186 (1974) ....................... 20

*Haimovitz v. United States Department of Justice*, 720 F. Supp. 516 (W.D. Pa. 1989), *aff'd*, 902 F.2d 1560 (3d Cir. 1990) ........................................................................... 19

\*Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993)... 3, 4, 15, 32, 33, 42

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ......................... 47, 48, 49

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) ........................ 9, 35, 54

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977) .................................................................... 26

*Jeffries v. Barr*, 965 F.3d 843 (D.C. Cir. 2020) ..................................... 45

*Johnson v. Williams*, 117 F. App'x 769 (D.C. Cir. 2004) ................. 10, 35

*Jones v. District of Columbia Department of Corrections*, 429 F.3d 276 (D.C. Cir. 2005) ....................................................... 51

*Kidd v. Mando American Corp.*, 731 F.3d 1196 (11th Cir. 2013) ..................................................................................... 18

*Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446 (2015) .......... 16, 21

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ........................... 57

*LePique v. Hove*, 217 F.3d 1012 (8th Cir. 2000) ................................... 18

*McCoy v. City of Shreveport*, 492 F.3d 551 (5th Cir. 2007) ................... 18

*McNair v. Computer Data Systems, Inc.*, 172 F.3d 863 (4th Cir. 1999) ........................................................................... 18

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986) ........... 31, 32

*Microimage Display Division of Xidex Corp. v. NLRB*, 924 F.2d 245 (D.C. Cir. 1991) ...................................................... 52, 53, 54

*Milner v. Department of Navy*, 562 U.S. 562 (2011) ............................. 27

*Monessen Southwestern Railway Co. v. Morgan*, 486 U.S. 330 (1988) ............................................................................................ 20

*Morales-Vallellanes v. Potter*, 605 F.3d 27 (1st Cir. 2010) .................... 18

*Mungin v. Katten, Muchin & Zavis*, 116 F.3d 1549 (D.C. Cir. 1997) ............................................................................................ 38

*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ............................................................................................ 53

*Neder v. United States*, 527 U.S. 1 (1999) .............................................. 29

*NLRB v. SW General, Inc.*, 137 S. Ct. 929 (2017) ................................. 56

*Oguejiofo v. Bank of Tokyo Mitsubishi UFJ Ltd*, 704 F. App'x 164 (3d Cir. 2017) .................................................................... 18

*Ohal v. Board of Trustees of University of District of Columbia*, 100 F. App'x 833 (D.C. Cir. 2004) ...................................... 10

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) ................................................................................. 38, 46, 50

*Ortiz-Diaz v. United State HUD*, 867 F.3d 70 (D.C. Cir. 2017) ......................................................................................... 10, 35

*Pardo-Kronemann v. Donovan*, 601 F.3d 599 (D.C. Cir. 2010) .......... 9, 35

*Paroline v. United States*, 572 U.S. 434 (2014) ...................................... 30

*Patterson v. Johnson*, 505 F.3d 1296 (D.C. Cir. 2007) .......................... 11

*Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), superseded by statute as stated in Landgraf v. USI Film Products, 511 U.S. 244 (1994) ...................................................... 57, 58

*Psychotherapy & Counseling Ctr., Inc. v. Shalala (In re Psychotherapy & Counseling Center, Inc.)*, 195 B.R. 536 (Bankr. D.D.C. 1996) .......................................................... 20

*Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300 (D.C. Cir. 2003) ............... 53

*Roebuck v. Washington*, 408 F.3d 790 (D.C. Cir. 2005) ........................ 11

*Russell v. Principi*, 257 F.3d 815 (D.C. Cir. 2001) ........................... 11, 36

*Sanchez v. Denver Public Schools*, 164 F.3d 527 (10th Cir. 1998) ................................................................................ 18

*Spring v. Sheboygan Area School District*, 865 F.2d 883 (7th Cir.1989) .............................................................................. 19, 60

*Stewart v. Ashcroft*, 352 F.3d 422 (D.C. Cir. 2003) ............................... 10

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) ............................................................................ 61

*Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) ............... 24

*\*Threat v. City of Cleveland*, No. 20-4165, 6 F.4th 672, 2021 WL 3140525 (6th Cir. 2021) ........................................ 3, 28, 29, 30, 39

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) .................. 40

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ....................... 11, 36

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ............................................. 49

*\*United States v. Burwell*, 690 F.3d 500 (D.C. Cir. 2012) ..... 2, 16, 17, 21

*United States v. Guy*, 282 F.3d 991 (8th Cir. 2002) .............................. 20

*United Steelworkers of America, AFL-CIO-CLC v. Weber*, 443 U.S. 193 (1979) .......................................................................... 22, 38

*Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) .......................................................... 29

*Vance v. Ball State University*, 570 U.S. 421 (2013).............................53

*Walker v. Johnson*, 798 F.3d 1085 (D.C. Cir. 2015) ..........................7, 61

*White v. Burlington Northern & Santa Fe Railway Co.*, 364 F.3d 789 (6th Cir. 2004), *aff'd*, 548 U.S. 53 (2006)............................18

*Wiley v. Glassman*, 511 F.3d 151 (D.C. Cir. 2007) ..........................10, 35

*Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270 (7th Cir. 1996)......................................................................................37

*Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123 (2d Cir. 2004)......................................................................................18

*Wisconsin Department of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214 (1992) ....................................................29

*Youssef v. FBI*, 687 F.3d 397 (D.C. Cir. 2012).........................................9

## STATUTES

28 U.S.C. § 1291 .............................................................................5

28 U.S.C. § 1331 .............................................................................5

42 U.S.C. § 1981 .......................................................................57-58

42 U.S.C. § 2000e ..........................................................................40

42 U.S.C. § 2000e-1 .......................................................................40

*42 U.S.C. § 2000e-2(a)(1) ..................................... 5, 6, 14, 25, 62

42 U.S.C. § 2000e-3(a) ..................................................................32

Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071...............19

Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103 ..................................................................19

Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111–2, 123 Stat. 5...........................................................................19

LEGISLATIVE MATERIALS

110 Cong. Rec. 1662 (1964) (Additional views of Rep. McCulloch et al.) ................................................................. 38

110 Cong. Rec. 7242 (1964) (Statement of Sen. Case) .......................... 35

110 Cong. Rec. 7383 (1964) (Statement of Sen. Young) ....................... 34

110 Cong. Rec. 7778 (1964) (Statement of Sen. Tower) ....................... 57

110 Cong. Rec. 12597 (1964) ............................................... 55

H.R. Rep. No. 102-40(I) (1991), *as reprinted in* 1991 U.S.C.C.A.N. 549 ................................................................. 58

S. Rep. No. 88-867 (1964) ..................................................... 56

ADMINISTRATIVE RULINGS

*Lehmann v. Frank*, EEOC DOC 01860673, 1989 WL 1008741 (Feb. 22, 1989) ................................................................. 53

*Weaver v. Frank*, EEOC DOC 01883168, 1988 WL 920346 (Nov. 16, 1988) ................................................................. 53

OTHER AUTHORITIES

EEOC, U.S. GPO, *Legislative History of Titles VII and XI of Civil Rights Act of 1964* (1964) ........................................ 28, 34, 37, 55

3 *Oxford English Dictionary* (1933) ........................................ 26

President's Committee on Equal Employment Opportunity, *Report to the President* (Nov. 26, 1963). ............................................ 49

Respect, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/with%20respect%20to (last visited Aug. 26, 2021) ................................................................. 46

*Roget's International Thesaurus* (4th ed. 1977) .................................... 48

Antonin Scalia & Bryan Garner, *Reading Law* (2012) .......................... 30

Ahmed A. White, *My Coworker, My Enemy: Solidarity, Workplace Control, and the Class Politics of Title VII*, 63 Buff. L. Rev. 1061 (2015) ................................................................. 55

Rebecca Hanner White*, De Minimis Discrimination*, 47 Emory L.J. 1121 (1998) ......................................................................... 61

# GLOSSARY

| | |
|---|---|
| ADA | Americans with Disabilities Act |
| ADEA | Age Discrimination in Employment Act |
| CAC Br. | En Banc Brief of Constitutional Accountability Center |
| Chambers Br. | En Banc Opening Brief of Mary E. Chambers |
| EEOC | Equal Employment Opportunity Commission |
| GPO Legislative History | EEOC, U.S. GPO, *Legislative History of Titles VII and XI of Civil Rights Act of 1964* (1964) |
| Metro. Wash. Employment Br. | En Banc Brief of Metropolitan Washington Employment Lawyers Association |
| NRLA | National Labor Relations Act |
| Order | Order, *Chambers v. District of Columbia*, No. 19-7098 (D.C. Cir. May 5, 2021) |
| Panel Op. | Opinion, *Chambers v. District of Columbia*, No. 19-7098 (D.C. Cir. Feb. 19, 2021) (per curiam) |
| U.S. Br. | En Banc Brief of United States |

# INTRODUCTION

Congress enacted Title VII to "assure equality of employment opportunities" and remedy the important harms discrimination inflicts. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974). Discrimination can deprive victims of employment, reduce their wages, and trap them in low-status positions. With "lateral" transfers, however, these harms may be absent. A salesperson transferred from sporting goods to power tools, for example, may retain not just the same pay but the same duties, hours, and opportunities. In such cases, every circuit has adopted a pragmatic rule similar to this Court's: Plaintiffs must show a "materially adverse consequence," or "objectively tangible harm," from the transfer. *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999). As this Court has applied *Brown*, it requires only that a transfer have caused *some* material, objective harm—which can include less desirable shifts, diminished responsibilities, or decreased opportunities.

Now, the question for this Court is whether it should abrogate decades of statutory precedent, break with its sister circuits, and hold for the first time that Title VII permits suit over purely subjective harms. The answer should be no. *Brown* and its materiality requirement accord

1

with Title VII's text, precedent, and purposes; Chambers' position, by contrast, conflicts with decades of Supreme Court caselaw interpreting Title VII's discrimination provisions in just the way *Brown* does.

The starting point, however, should be the bedrock principle no other brief mentions: The "high burden" on "any party who urges … depart[ure] from … *stare decisis*." *United States v. Burwell*, 690 F.3d 500, 504 (D.C. Cir. 2012) (en banc). *Stare decisis* is "of fundamental importance to the rule of law." *Id.* It retains power even *en banc. Id.* And it applies with "greater" force in statutory cases. *Id.* Here, not only has "[e]very other circuit to have considered the issue … taken the same approach," Panel Op. 6-7 (Tatel, J., concurring), but they have for decades. Meanwhile, Congress has been active in amending Title VII and rejecting interpretations it deems wrong. But it has never touched the consensus that transfer plaintiffs must show material, objective harm.

Chambers does not come close to carrying the burden needed to abrogate decades-old statutory precedent. To the contrary, *Brown* is correct, and Chambers' contrary arguments lack merit. She avers that the word "discriminate" means "any differential treatment" and that the phrase "terms, conditions, and privileges of employment" "encompass[es]

all attributes of the employer-employee relationship." Chambers Br. 16-17. Those definitions, she says, leave no room for requiring that a plaintiff show *harm*, much less material or objective harm.

But as Judge Sutton explained about the Sixth Circuit's similar rule, there is no such "gap between the words of Title VII and [this Court's] liquidation of those words." *Threat v. City of Cleveland*, No. 20-4165, 6 F.4th 672, 2021 WL 3140525, at *3 (6th Cir. 2021). Instead, Section 703(a)(1) "reasonably sweeps in … an adversity and a materiality threshold." *Id.* The Supreme Court has interpreted the phrase "discriminate against" as meaning to "treat[] … individuals *worse*," *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1740 (2020), in a manner "that *injure[s]*," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006). It has also interpreted Section 703(a)(1) as not reaching *every* action that alters a "term" or "condition" of employment. Rather, the action must "sufficiently" do so "as to implicate Title VII." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993). And the Court has interpreted Title VII's ban on retaliatory "discrimination" to reach only "materially adverse" actions imposing "objective" harm. *White*, 548 U.S. at 68.

*Brown*'s interpretation is thus foursquare aligned with the Supreme Court's own. And like these decisions, *Brown* interprets Title VII not just textually but reasonably. The Supreme Court has crafted its interpretations to ensure that Title VII captures "discriminatory conduct" implicating "Title VII's broad rule of workplace equality." *Harris*, 510 U.S. at 22. But lawsuits are not cost-free. And the Court's interpretations recognize that fact too. The Court has thus charted a "middle path," *id.* at 21-22, that looks for material, objective harm and places outside of Title VII's ambit suits based on "offensive feelings," *id.*, and "petty slights," *White*, 548 U.S. at 68. *Brown*'s rule strikes that same reasonable balance—though, in truth, "middle path" does not aptly describe a rule so tilted towards employees. While subjective preferences do not open the doors to federal court, employees may sue over any transfer that leaves them in a materially, objectively worse position.

We should all work toward a world in which no one discriminates, harasses, or retaliates. The law, however, often targets its remedies at material harm. Chambers' arguments cannot overcome the Supreme Court's decisions interpreting Title VII to do just that. Nor can they overcome the force of *stare decisis* supporting *Brown*, whose rule is

4

reasonable, workable, and settled.  Indeed, many seminal Title VII decisions—including decisions adopting disparate-impact liability and turning aside challenges to private affirmative action—depend on rejecting literalistic arguments like those Chambers offers.  *Amicus* respectfully suggests that the proper course is to adhere to *stare decisis* and avoid the instability that comes from reopening settled statutory law.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 because the complaint alleged violations of Title VII of the Civil Rights Act of 1964.  This Court has jurisdiction under 28 U.S.C. § 1291 because this appeal, filed on August 21, 2019, arises out of a final judgment of the district court on July 24, 2019 and is timely.

## STATEMENT OF THE ISSUE

Whether this Court should overrule its statutory precedent that the denial or forced acceptance of a job transfer is actionable under Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1), only if there are "some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities

such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." *Brown*, 199 F.3d at 457.

## STATUTES AND REGULATIONS

Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1), provides:

It shall be an unlawful employment practice for an employer—

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

## STATEMENT OF THE CASE

### A.     Title VII's Substantive Prohibitions On Discrimination.

"Congress enacted Title VII … to assure equality of employment opportunities." *Alexander*, 415 U.S. at 44.  Its main anti-discrimination provision, Section 703(a)(1), provides that it "shall be an unlawful employment practice for an employer" to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

Where a plaintiff lacks direct evidence of discrimination, this Court applies "the familiar, burden-shifting framework of *McDonnell Douglas*

*Corp. v. Green,* 411 U.S. 792 (1973)." *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015). The plaintiff must establish "that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that his employer took the action because of his membership in the protected class)." *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002). If the plaintiff does, "the burden shifts to the employer to identify the legitimate, non-discriminatory … reason on which it relied in taking the complained-of action." *Walker*, 798 F.3d at 1092. Then, the "central question" becomes whether "the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination." *Id.* at 1091.

### B.   *Brown's* Requirement Of Material, Objective Harm.

In *Brown*, this Court first considered a Title VII claim based on a "purely lateral transfer." 199 F.3d at 456. When Brown's work—writing loans for the Inter-American Development Bank—dried up, the Bank transferred her to a job she did not prefer (Contracts Administration) and declined to transfer her to the job she desired (Project Finance). *Id.* at 449. Brown's pay, benefits, and levels of responsibility remained the

7

same.  Indeed, shortly after, she left for a presidentially appointed position (and higher salary) as Deputy Assistant Secretary of State for African Affairs.  *Id.* at 448, 455.  Nonetheless, Brown sued under Title VII.  This Court thus considered whether she stated a "prima facie case" based on the denial and forced acceptance of her lateral transfers.  *Id.*

The Court answered no.  It observed that a "wide and deep" consensus agreed that "a purely lateral transfer" does not constitute an adverse employment action actionable under Title VII.  *Id.* at 456 (citing cases).  That consensus, this Court explained, correctly recognized that "[m]ere idiosyncrasies of personal preference are not sufficient to state an injury."  *Id.*  The Court thus "announce[d] the following rule: a plaintiff who is made to undertake or who is denied a lateral transfer—that is, one in which she suffers no diminution in pay or benefits—does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such … that the plaintiff has suffered objectively tangible harm."  *Id.* at 457.

This Court found that Brown had not shown material harm: While she "was temporarily reassigned to a position she thought undesirable,"

8

she was "was not discharged" and "retained the same rank and salary." *Id.* Nor did her opportunities suffer: Shortly after, she left "for a more prestigious position and a … raise." *Id.*

*Brown*'s standard is now "well-established," *Czekalski v. LaHood*, 589 F.3d 449, 454 (D.C. Cir. 2009), but not burdensome. Instead, *Brown* is a run-of-the-mill materiality requirement that just excludes lateral transfers yielding no objective harm. More burdensome or less desirable working conditions can satisfy *Brown*—including, for example, an "undesirable" transfer to the "night shift," *Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840, 844 (D.C. Cir. 2001), or a "switch[] to a rotating shift" that is a "considerabl[e] inconvenience[]," *Ginger v. District of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008). If plaintiffs lose job responsibilities or supervisory authority, that counts too—even with no "decrease in pay or benefits." *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010). Hence, this Court found *Brown* satisfied where a plaintiff's "skills and education [we]re not being fully utilized," *id.*; *accord Youssef v. FBI*, 687 F.3d 397, 401-02 (D.C. Cir. 2012), and where the plaintiff "perform[ed] work well below her grade level," *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006), and

9

"supervised fewer … employees" with a smaller "budget," *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007); *see Ohal v. Board of Trustees of University of D.C.*, 100 F. App'x 833, 834 (D.C. Cir. 2004).

Also sufficient is an impact on "opportunity to advance." *Stewart v. Ashcroft*, 352 F.3d 422, 426-27 (D.C. Cir. 2003). "[E]xclusion from [a] rotation" as "managing editor" satisfied *Brown* because it deprived the plaintiff of supervisory experience. *Wiley v. Glassman*, 511 F.3d 151, 157 (D.C. Cir. 2007). Indeed, discrimination *itself* can render a transfer decision "materially adverse." In *Ortiz-Diaz v. U.S. HUD*, 867 F.3d 70 (D.C. Cir. 2017), this Court held that denial of "a transfer away from a racially and ethnically biased supervisor to a non-biased supervisor more likely to advance [the plaintiff's] career, falls within Title VII's heartland … given the adverse impact on … potential for career advancement," *id.* at 74; *accord Geleta v. Gray*, 645 F.3d 408, 411-12 (D.C. Cir. 2011); *cf. Johnson v. Williams*, 117 F. App'x 769, 771-72 (D.C. Cir. 2004) ("losing the potential to use previously developed contacts" could be actionable if it "plausib[ly]" affected plaintiff's opportunity to do his job).

On the other side, *Brown* excludes suits based on "[p]urely subjective injuries." *Forkkio*, 306 F.3d at 1130. It thus "makes clear that

not everything that makes an employee unhappy"—including the most "trivial employment actions"—"is … actionable," *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001).   Plaintiffs cannot rely on "conclusory assertions of loss of prestige," *id.*, claims that a transfer decision "caused [them] to feel 'undermin[ed],'" *Patterson v. Johnson*, 505 F.3d 1296, 1298 (D.C. Cir. 2007), or petty slights like the loss of a lawyer's opportunity to submit "briefs directly to a top supervisor," *Broderick v. Donaldson*, 437 F.3d 1226, 1233 (D.C. Cir. 2006); *accord Currier v. Postmaster General*, 304 F.3d 87, 88–89 (D.C. Cir. 2002) (no claim based on transfer from one "do nothing position" to a similar position).   In *Roebuck v. Washington*, 408 F.3d 790, 794 (D.C. Cir. 2005), for example, this Court held that an assistant did not suffer objective harm from a requirement to "swap[] duties with another"—but cautioned that a transfer would satisfy *Brown* if the new supervisor would make life "hell."   *Id.*

### C.    This Case.

Chambers served as a Support Enforcement Specialist in the Child Support Division of the District's Office of the Attorney General.   Panel Op. 2.   She requested a transfer from the Interstate Unit to the Intake Unit—a lateral transfer that did not affect her pay, hours, or levels of

responsibility.  *Id.* at 3.  After the District denied the request, Chambers

filed a discrimination charge with the EEOC.  *Id.*  Later, she renewed her

transfer request, which the District again denied.  *Id.*  The denial

explained that the request did "not fit into management's immediate

plans" and that her unit needed to "maintain … its current staffing level."

JA75.  Again, Chambers filed a discrimination charge with the EEOC.

Panel Op. 3.  After one more unsuccessful transfer request, Chambers

sued, alleging discrimination in violation of Title VII.  *Id.*  (Chambers also

raised a retaliation claim, which is not at issue here.  *Id.*; *infra* Part IV).

After discovery, the district court granted summary judgment to

the District, and a panel affirmed.  The panel explained that under

*McDonnell Douglas*, the "threshold question … is whether Chambers …

suffered an adverse employment action."  *Id.* at 5.  Chambers, however,

failed to make the modest showing *Brown* requires—*i.e.*, "some other

materially adverse consequences affecting the terms, conditions, or

privileges of employment or future employment opportunities."  *Id.* at 6.

First, Chambers argued that her transfer denial "resulted in lost

awards and career advancement opportunities'" because a male colleague

who was transferred to her desired unit [*i.e.*, the Intake Unit]

subsequently received a promotion and incentive awards." *Id.* at 6.  The panel did not doubt that such consequences could support a claim.  But the panel found that "no reasonable jury" could credit Chamber's theory—because the male colleague received his promotion and won his awards based on work he performed "after he was transferred *out* of the Intake Unit" (the place where Chambers desired to transfer)  *Id.* at 6-7.

Second, Chambers asserted that the transfer denial left her mired in "unbearable working conditions" because she was "forced to manage a disproportionate share of cases" and even "had to take an extended medical leave." *Id.* at 7.  Again, the panel did not dispute that such burdens are actionable.  *Id.*  Chambers, however, presented no evidence "about the caseloads carried by her coworkers," and "no record evidence support[ed] her claim that something about her working environment required leave." *Id.*

Judges Tatel and Ginsburg also concurred, explaining that *Brown* compelled the panel's result but urging *en banc* reconsideration.

### D.   *En Banc* Review.

This Court ordered *en banc* rehearing and appointed *Amicus* "to defend the proposition that the court should retain the rule that the

denial or forced acceptance of a job transfer is actionable under Title VII, 42 U.S.C. 2000e-2(a)(1), only if there is 'objectively tangible harm.'" Order.2 (quoting *Brown*, 199 F.3d at 457).

*Amicus* begins with how he understands his charge. This Court has applied *Brown* in two different contexts—first, in assessing whether plaintiffs have shown the type of "adverse personnel action" *McDonnell Douglas* demands (in cases based on circumstantial evidence), and second, as a substantive element of a Title VII discrimination claim (applicable to any type of evidence). *Amicus* understands this Court's order to direct him to defend the second proposition (from which the first proposition necessarily follows). Order 2; *cf.* Panel Op. 6 (Tatel, J., concurring) (observing that "under current circuit law," *Brown* applies even where direct evidence of discrimination exists).

## STANDARD OF REVIEW

This Court reviews *de novo* the question of when lateral transfers are actionable under 42 U.S.C. § 2000e-2(a)(1), subject to the rules of *stare decisis*. *Fogg v. Ashcroft*, 254 F.3d 103, 107 (D.C. Cir. 2001).

## SUMMARY OF ARGUMENT

I. *Brown* is not just this Circuit's law. It accords with a decades-old, cross-circuit consensus on a question of statutory interpretation. Its rule is both reasonable and workable. And if Congress believed that every circuit had gotten Title VII wrong, Congress could have acted. But so far, it has not. Now, *stare decisis*—which applies with special strength to statutory questions and retains force even *en banc*—militates powerfully against shattering the circuits' consensus.

II. *Brown*'s rule is also correct. It aligns with Title VII's text, relevant background principles, and the Supreme Court's decisions interpreting Title VII. *Brown* requires lateral-transfer plaintiffs to show they were treated "worse," *Bostock*, 140 S. Ct. at 1740, in a manner that "injure[d]," *White*, 548 U.S. at 59, and did so "objectively" and "sufficiently" to implicate Title VII's anti-discrimination mandate, *Harris*, 510 U.S. at 21; *see White*, 548 U.S. at 68. By contrast, Chambers' position—that Title VII reaches "any differential treatment," even if it causes no material or objective harm, Chambers Br. 16—cannot be squared with Title VII's text or binding precedent interpreting that text. Indeed, her disagreement is not really with *Brown*. It is with the long

line of Supreme Court decisions interpreting Title VII's discrimination provisions just as *Brown* does. But again, if Chambers or her *amici* believe this interpretation is wrong, Congress is their forum.

## ARGUMENT

This Court should adhere to *Brown*'s rule that lateral-transfer plaintiffs must show material, objective harm and reject Chambers' invitation to break from the circuits' consensus.

## I.  Overruling *Brown* Will Undermine The Values *Stare Decisis* Protects.

For decades, *Brown* has been the law of this Circuit (much like every other). And even when this Court sits *en banc*, it imposes a "high burden … on any party who urges … depart[ure] from … *stare decisis*." *Burwell*, 690 F.3d at 504. That is because "*stare decisis* is of fundamental importance to the rule of law." *Id.* It "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 455 (2015). Indeed, *stare decisis* applies with particular force "where the Court is asked to overrule a point of statutory construction"—because "Congress remains free to alter" the result. *Burwell*, 690 F.3d at 504.

A. This Court has consistently heeded those principles (though they go unmentioned by Chambers, the other *amici*, and the District). Even when it has gone *en banc* to consider overruling a statutory precedent, the Court has often invoked *stare decisis* and declined—despite recognizing substantial arguments that might, on a blank slate, justify a different result. *See Burwell*, 690 F.3d at 515 (litigant failed to carry "substantial burden" required to overrule panel precedent); *id.* at 517 (Sentelle, J., concurring) (adhering to precedent, despite "well-reasoned arguments" for overruling it, "because of the stability principle inherent in … *stare decisis*"); *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 875 (D.C. Cir. 1992) ("In obedience to … *stare decisis*," Court declined "to set aside circuit precedent of almost twenty years' standing"); *id.* at 880 (Randolph, J., joined by Silberman and Sentelle, JJ. (similar); *id.* at 882 (R.B. Ginsburg, J., joined by Mikva, Wald, and Edwards, JJ.) (emphasizing that *stare decisis* is "sound policy" and dissenting insofar as *en banc* Court narrowed precedent).

B. Here, too, *stare decisis* is powerful. *Brown* is not just a statutory precedent; it is one where "[e]very other circuit to have considered the issue has taken the same approach." Panel Op. 6-7 (Tatel, J., concurring);

*compare Critical Mass*, 975 F.2d at 876 (declining to abrogate panel precedent where "[t]o date, seven [circuits] have adopted its test [and] none has rejected it"), *with, e.g.*, *Morales-Vallellanes v. Potter*, 605 F.3d 27, 35 (1st Cir. 2010); *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004); *Oguejiofo v. Bank of Tokyo Mitsubishi UFJ Ltd*, 704 F. App'x 164, 168 (3d Cir. 2017); *McNair v. Computer Data Sys., Inc.*, 172 F.3d 863 (4th Cir. 1999); *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 797 (6th Cir. 2004), *aff'd*, 548 U.S. 53 (2006); *Flaherty v. Gas Rsch. Inst.*, 31 F.3d 451, 457 (7th Cir. 1994); *LePique v. Hove*, 217 F.3d 1012, 1013 (8th Cir. 2000); *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1126 (9th Cir. 2000); *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 n.6 (10th Cir. 1998); *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1204 n.11 (11th Cir. 2013); *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998) (all applying rules similar to *Brown*); *accord* District. Br. 3-4 (additional cases).[1]

This "wide and deep" consensus, moreover, is longstanding and

---

[1] The Fifth Circuit's rule is even more stringent. *McCoy v. City of Shreveport,* 492 F.3d 551, 559 (5th Cir. 2007) (requiring "ultimate" employment action).

predates *Brown*. *Brown*, 199 F.3d at 456; *see, e.g., Connell v. Bank of Boston*, 924 F.2d 1169, 1178–80 (1st Cir. 1991); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 885–86 (7th Cir. 1989); *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985); *Haimovitz v. U. S. Dep't of Just.*, 720 F. Supp. 516, 523–27 (W.D. Pa. 1989), *aff'd*, 902 F.2d 1560 (3d Cir. 1990). All that time, Congress has been attentive to how courts have interpreted Title VII. In 1972, 1991, and 2009, it amended Title VII, including to correct readings it believed got Title VII wrong.[2] If Congress believed the circuits' consensus was error, it has had ample chance to act. It could do so tomorrow. Yet instead, Congress has left the consensus undisturbed.

In these circumstances, *stare decisis* should carry no less force here than in the Supreme Court. Sometimes *en banc*, the effect of *stare decisis* may be muted. That is because "there are thirteen" circuits, which "will at times interpret the same statute in different ways"; because "circuit precedent is generally established by" panels; and because the work of

---

[2] *See* Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103; Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071; Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111–2, 123 Stat. 5.

panels may be less visible to Congress. *Critical Mass*, 975 F.2d at 876. None of that, however, is true here. *Brown* has been the law of this Circuit for decades. And a towering wall of circuit precedent—easily prominent enough for Congress to note—agrees.

This Court should not rush ahead of Congress. "Congress' failure to disturb a consistent judicial interpretation of a statute may provide some indication that Congress at least acquiesces in, and apparently affirms, that [interpretation]." *Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 338 (1988). And where the circuits have interpreted a statute "with almost perfect consistency" for "four decades," "continued congressional silence" carries significant weight. *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200-01 (1974); *Critical Mass*, 975 F.2d at 876 (observing that the *en banc* Court previously "overturned a four-year old [panel] precedent" but declining to abrogate a 20-year-old precedent where no "subsequent action in Congress" undermined it and the circuits agreed).[3]

---

[3] *Cf. United States v. Guy*, 282 F.3d 991, 995 (8th Cir. 2002) (Carjacking Correction Act of 1996 abrogated *United States v. Rivera*, 83 F.3d 542, 547-48 (1st Cir. 1996)); *Psychotherapy & Counseling Ctr., Inc. v. Shalala (In re Psychotherapy & Counseling Ctr., Inc.)*, 195 B.R. 536, 539 (Bankr. D.D.C. 1996) (Bankruptcy Reform Act of 1994 overruled "*Deprizio*" line of cases in the circuit courts).

Chambers and her *amici* cannot show that this case falls within the "very narrow range of circumstances" in which courts may jettison statutory precedent. *Burwell*, 690 F.3d at 504. No "intervening development" has weakened *Brown*, *id.*; instead, the most relevant intervening decision—*White*—supports *Brown*. *Infra* 32-33. Nor has *Brown* proven "unworkable." *Burwell*, 690 F.3d at 504. Quite the opposite: For decades this Court has applied *Brown* without incident. Instead, the only real argument on the other side is that *Brown* was wrong as an original matter. That claim is incorrect. *Infra* Part II. But equally important, such claims never provide the "special justification" required to overrule statutory precedent. *Kimble*, 576 U.S. at 456. After all, by its nature "*stare decisis* means sticking to some wrong decisions" and "has consequence only to the extent it sustains incorrect decisions." *Id.* at 455-56.

C. Because Chambers and *amici* ignore *stare decisis*, they do not grapple with the destabilizing consequences that abandoning *stare decisis* threatens. Many seminal Title VII precedents were contentious and have been criticized on the same grounds on which Chambers criticizes *Brown*—as inconsistent with Title VII's literal text, or as

incorrectly balancing Title VII's competing purposes. *McDonnell Douglas*'s burden-shifting framework, for example, has been characterized as "federal common law," *Aquino v. Honda of Am., Inc.*, 158 F. App'x 667, 676 (6th Cir. 2005), and criticized as inconsistent with "the clear text of the statute," *Griffith v. City of Des Moines*, 387 F.3d 733, 745 (8th Cir. 2004) (Magnuson, J., concurring).

Closer to home, the Supreme Court has twice considered and rejected the core claim that Chambers and her *amici* advance: namely, that Section 703(a)(1) must be interpreted as broadly as its unadorned text might permit. In *Weber*, challengers argued that Title VII "prohibit[s] race-conscious affirmative action plans." *United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 197 (1979). They contended, and several Justices agreed, that "[w]ere Congress to act today specifically to prohibit th[is] type of conduct," it "would be hard pressed to draft language better tailored to the task than that found in … Title VII"—citing Section 703(a)(1). *Id.* at 226-27 & n.7 (Rehnquist, J., dissenting). The Court did not gainsay that textual point. Yet it declined to embrace "a literal construction of §[] 703(a)." *Id.* Instead, the Court looked to Title VII's "purpose" and "context" and declined to interpret

Section 703(a) as broadly as its text might permit.

The Court reached the same result in *Guerra*. Again, challengers argued—and several Justices agreed—that the Pregnancy Discrimination Act and Section 703(a) preempted a California statute that treated pregnant women more favorably than other disabled employees. *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 292, 297 (1987) (White, J., dissenting). And again, the Court did not dispute that the statutory language "leaves no room for preferential treatment of pregnant workers." *Id.* Instead, it cited *Weber*, interpreted Section 703(a) in light of its "purpose" and "context," and declined to embrace a literalist reading. *Id.* at 284; *accord Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1504 (10th Cir. 1995) ("[i]n the employment discrimination context, the Supreme Court has held that Title VII's bar on all discrimination … should not be read literally.").

The opinion in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), is similar. *Griggs* held that Section 703(a)(2) provides for a "disparate impact" theory of liability. *Id.* at 431. Recently, however, Justice Thomas criticized *Griggs* as inconsistent with "any fair reading of the text" and found that *Griggs* could be sustained, if at all, only "as a matter of *stare*

decisis." *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 547, 553 (2015) (Thomas, J., dissenting).

This Court of course lacks power to overrule *McDonnell Douglas*, *Weber*, *Guerra*, or *Griggs*. The question, however, is not what this Court has power to do. It is what principled approach to *stare decisis* the Court should adopt. *Amicus* respectfully suggests that the correct approach is the one that would sustain all of these decisions and avoid the instability threatened by inviting a wholesale reconsideration of Title VII precedents based on arguments like those Chambers offers.

## II. *Brown's* Rule Accords With Title VII's Text, The Supreme Court's Authoritative Decisions, And Title VII's Purposes.

This Court, however, need not even reach the "special justifications" required to abandon *stare decisis*. *Brown* was correct when decided and remains correct today. Title VII's text, precedent, and purposes all support its rule: Plaintiffs may sue if a lateral-transfer decision leaves them materially worse off but not just to vindicate "personal preference" for a particular job. *Brown*, 199 F.3d at 457.

*Amicus* proceeds in two principal parts, corresponding to Section 703(a)(1)'s two halves. Section 703(a)(1) begins by declaring it an unlawful employment practice "to fail or refuse to hire or to discharge

any individual, or otherwise to discriminate against any individual"
based on a protected characteristic. 42 U.S.C. § 2000e-2(a)(1). Then,
Section 703(a)(1) carves out some discrimination from its prohibition and
limits its scope to discrimination "with respect to … compensation, terms,
conditions, or privileges of employment." *Id.* *Amicus* shows that both
halves of Section 703(a)(1) support *Brown*. Thereafter, *Amicus* addresses
a few additional arguments raised by Chambers and her *amici*.

### A. In Title VII, The Phrase "Otherwise Discriminate Against" Means To Inflict Material, Objective Harm.

#### 1. *Brown* Accords With Title VII's Text And The Supreme Court's Precedent Interpreting That Text.

As *Brown* correctly recognizes, the phrase "to otherwise
discriminate against" in Title VII means to treat worse in a manner that
inflicts material, objective harm. That reading accords with Title VII's
statutory text, relevant background principles, and the Supreme Court's
decisions in *Meritor*, *Harris*, and *White*—all of which interpret Title VII's
discrimination provisions to require material, objective harm.

i. Chambers and her *amici* rely heavily on the observation that the
word "discriminate," standing alone, can reach "any differential
treatment." Chambers Br. 16; *see id.* at 26. In Section 703(a)(1),
however, Congress used this word in the phrase "otherwise discriminate

against." And this context matters, as the Supreme Court has recognized. In "1964," the word "discriminate" "meant … roughly what it means today"—*i.e.*, "[t]o make a difference in treatment or favor." *Bostock*, 140 S. Ct. at 1740 (quoting *Webster's New International Dictionary* 745 (2d ed. 1954)). But the larger phrase—"[t]o 'discriminate against'"—"mean[s] treating [an] individual *worse* than others who are similarly situated." *Id.* (emphasis added). And in particular, the Supreme Court underscored that the phrase "discrimination against" means adverse treatment that *harms*: "No one doubts that the term 'discriminate against' refers to distinctions … in treatment *that injure* protected individuals." *White*, 548 U.S. at 59-60 (emphasis added).[4]

If Chambers were right that the phrase "otherwise discriminate against" reaches "any differential treatment," this phrase in substance would cover any practice that "limit[s], segregate[s], or classif[ies]" based on protected characteristics. But Congress knew how to employ that

---

[4] *Accord Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (Section 703(a) prohibits "treat[ing] some people less favorably than others because of their race, color, religion, sex, or national origin"); *cf.* 3 *Oxford English Dictionary* 436 (1933) (defining "discriminate" as, *inter alia*, "to make an adverse distinction with regard to; to distinguish unfavourably from").

broader meaning. It did so in Title VII's *next* provision, Section 703(a)(2). The "usual rule" is that "when the legislature uses certain language in one part of the statute and different language in another, … different meanings were intended." *Milner v. Dep't of Navy*, 562 U.S. 562, 584 (2011). More than that, when Congress employed the broader formulation in Section 703(a)(2), Congress paired it with a requirement that the limit, segregation, or classification must "tend[] to deprive an[] individual of employment opportunities or otherwise adversely affect[] his status." Chambers' interpretation is thus doubly flawed: It erases Congress's distinction between Section 703(a)'s two subsections. And it does so to avoid Section 703(a)(2)'s adverse-effect requirement.

This point also shows that the United States gets it backwards when it argues that, because Section 703(a)(2) expressly requires an adverse effect, Section 703(a)(1) cannot. U.S. Br. 16-17. Section 703(a)(1) had no need to include a similarly express requirement because, as just explained, the natural meaning of the phrase "discriminate against" already includes such a requirement. The same, however, cannot be said of Section 703(a)(2) and its prohibition on (for example) "classify[ing]" employees based on protected characteristics. Absent an adverse-effect

requirement, Section 703(a)(2) would prohibit (for example) gender-specific uniforms or tracking race-based employment statistics. Indeed, Chambers' interpretation would absurdly make that same conduct actionable under Section 703(a)(1), even though Congress carefully excluded it under Section 703(a)(2).[5]

ii.   Background principles and context underscore that Section 703(a)(1) requires not just harm but *material* harm—as Judge Sutton observed when discussing the Sixth Circuit's near-identical "materially adverse" requirement.  First, a rule requiring that "a discrimination claim involve[] a meaningful difference in the terms of employment … ensures that any claim … involves an Article III injury."  *Threat*, 2021 WL 3140525, at *3 (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190,

---

[5] Legislative history, for those who consider it, supports this conclusion. Senators Clark and Case, who managed Title VII on the Senate floor, explained that Title VII makes it an "unlawful employment practice" "to refuse to hire or to discharge any individual or otherwise to discriminate against him with respect to compensation or terms or conditions of employment because of [a protected characteristic] *in such a way as to deprive them of employment opportunities or otherwise affect adversely their employment status.*" EEOC, U.S. GPO, *Legislative History of Titles VII and XI of Civil Rights Act of 1964*, 3039 (1964) ("GPO Legislative History") (emphasis added).  The Senators thus recognized that the phrase "otherwise discriminate against" in Section 703(a)(1) impliedly includes the same requirements Section 703(a)(2) had to make explicit.

2200 (2021)). Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion*, 141 S. Ct. at 2205.

Second, this requirement accords with the "ancient" doctrine of "de minimis non curat lex (the law does not take account of trifles)." *Threat*, 2021 WL 3140525, at *3 (quotation marks omitted). This doctrine is "part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept." *Id.* (quoting *Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992)). Indeed, the Supreme Court has applied this doctrine to reject an argument almost exactly the same as Chambers'—that unqualified statutory text left no room for a "substantiality" limitation. *Wis. Dep't of Revenue*, 505 U.S. at 231; *accord, e.g.*, *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) (False Claims Act impliedly requires materiality); *Neder v. United States,* 527 U.S. 1, 21-23 (1999) (materiality requirement implicit in 18 U.S.C. § 7206).

As Judge Sutton observed, Congress in Title VII "provided no indication that it sought to disregard" this background principle "or to

use the word 'discriminate' to cover any difference in personnel matters."
*Threat*, 2021 WL 3140525, at *4.  To the contrary, Title VII's text and
structure confirm that Congress embraced that background principle.

In Section 703(a)(1), Congress did not prohibit "discrimination" in
a vacuum.  It specified that employers may not "fail or refuse to hire or
to discharge any individual, or *otherwise to discriminate against* any
individual" in their "compensation, terms, conditions, or privileges of
employment."  The *ejusdem generis* canon recognizes that when "general
words" (like the phrase "otherwise to discriminate") "follow an
enumeration of two or more things" (like "fail or refuse to hire or to
discharge"), the general words "apply only to persons or things of the
same kind or class specifically mentioned."  Antonin Scalia & Bryan
Garner, *Reading Law*, at 199 (2012); *see, e.g.*, *Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612, 1625 (2018); *Paroline v. United States*, 572 U.S. 434, 447
(2014).  Here, the specific enumerated actions ("fail[ing] or refus[ing] to
hire," or "discharg[ing]") are material, objective harms.  Hence, the
*ejusdem generis* canon teaches—just as *Meritor*, *Harris*, and *Brown* hold,
*infra* 31-33—that the more general phrase that follows ("otherwise to
discriminate") presumptively applies to other material, objective harms.

30

In fact, *Babb v. Wilkie*, 140 S. Ct. 1168 (2020), recently applied the *ejusdem generis* canon to this very phrase. *Babb* held that the anti-discrimination provision in the Age Discrimination in Employment Act ("ADEA")—which Congress modeled on Title VII—does not reach *all* differential treatment but only discrimination in "end results." *Id.* at 1176. And to support that conclusion, *Babb* explained that "even if 'discriminating with respect to compensation, terms, conditions, or privileges of employment' could be read … to encompass things that occur before a final decision …, the *ejusdem generis* canon would counsel a court to read that final phrase to refer—like the prior terms—to the final decision." *Id.* at 1176 n.4. Just as each of the prior terms (failing or refusing to hire, or discharging) are "final" actions, each is a material, objective harm.

iii. These textual points explain why the Supreme Court has repeatedly interpreted Title VII's discrimination provisions just as *Brown* does—as requiring material, objective harm. The Court did so, first, in *Meritor* and *Harris*. Those decisions hold that Section 703(a)(1) prohibits conduct that creates a hostile work environment, on the theory that a hostile work environment is a "condition" of employment. *Meritor*

31

*Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Harris*, 510 U.S. at 21. Those cases, however, also hold that Section 703(a)(1) does not render actionable *every* action arguably altering conditions of employment. It reaches only conduct that "sufficiently affect[s] the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21-22; *see Meritor*, 477 U.S. at 67 (endorsing statement that conduct must "affect the conditions of employment to [a] sufficiently significant degree"). Those decisions also emphasize that "[c]onduct that is not severe or pervasive enough to create an *objectively* hostile … work environment … is beyond Title VII[]." *Harris*, 510 U.S. at 21 (emphasis added).

The Supreme Court adopted a similar interpretation in *White*, which construed Title VII's anti-retaliation provision to require material, objective harm. Section 704(a) makes it an unfair employment practice "to *discriminate against* any individual … because he has opposed any practice made an unlawful practice by this subchapter." 42 U.S.C. § 2000e-3(a) (emphasis added). *White* interpreted this provision to "protect[] an individual not from all retaliation, but from retaliation that produces an injury or harm." 548 U.S. at 68. And like *Meritor* and *Harris*, *White* required that the action be "materially adverse" from the

perspective of a "reasonable employee."  *Id.* at 68.

*Brown* thus aligns with Title VII's text, relevant background principles, and the Supreme Court's decisions.  It requires lateral-transfer plaintiffs to show they were treated "worse," *Bostock*, 140 S. Ct. at 1740, in a manner that "injure[d]," *White*, 548 U.S. at 59, and did so "objectively" and "sufficiently" to implicate Title VII's anti-discrimination mandate, *Harris*, 510 U.S. at 21; *see White*, 548 U.S. at 68.

### 2. *Brown* Balances Title VII's Competing Purposes In Just The Way The Supreme Court Has Directed.

The Supreme Court's decisions in *Meritor*, *Harris*, and *White* are also about more than parsing dictionaries and grammar books.  They give Title VII a pragmatic construction that balances Title VII's competing purposes and recognizes that those purposes make it "important to separate significant from trivial harms."  *White*, 548 U.S. at 68.  Hence, *Harris* self-consciously charted a "middle path" that declined to invite a flood of cases where the sole harm was "engender[ing] offensive feelings" but ensured that Title VII captures "discriminatory conduct" that implicates "Title VII's broad rule of workplace equality."  510 U.S. at 21-22.  *White*, too, "prohibit[ed] employer actions … likely to deter" complaints while recognizing that Title VII does not reach "petty slights

or minor annoyances that often take place at work." 548 U.S. at 68.

*Brown* accommodates the competing concerns in the same way the Court did in *Meritor*, *Harris*, and *White*: Via a materiality requirement providing that plaintiffs may sue over transfers so long as the plaintiffs show material, objective harm. This rule protects the plaintiff who gets stuck with worse hours or a dead-end position but recognizes that a preference for selling sporting goods instead of power tools, *supra* 1, is not the stuff of a federal suit.

A. First and foremost, *Brown*'s rule furthers the "basic objective" of Title VII's antidiscrimination provision: to ensure "equality of employment opportunities" and the "elimination of practices that tend to bring about 'stratified job environments.'" *White*, 548 U.S. at 63; *accord Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976) (cited at Chambers Br. 20) (similar statement of Title VII's purpose).[6] If plaintiffs

---

[6] *Accord Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975) (Title VII's "primary objective ... was to achieve equality of employment opportunities"); GPO Legislative History at 3039 (Clark/Case interpretive memorandum emphasizing that Title VII targets actions that "deprive [employees] of employment opportunities or otherwise affect adversely their employment status"); 110 Cong. Rec. 7383 (1964) (Statement of Sen. Young) (Title VII "will merely make equality of opportunity a reality for all Americans").

show that transfer decisions reduced their "employment opportunities," their claims proceed. *Brown*, 199 F.3d at 457; *supra* 9-10.

To recap: Decisions that deny plaintiffs supervisory experience, *Wiley*, 511 F.3d at 157, reduce job responsibilities, *Pardo-Kronemann*, 601 F.3d at 607, prevent plaintiffs from "us[ing] previously developed contacts," *Johnson*, 117 F. App'x at 771-72, or leave plaintiffs stuck with a "biased supervisor" who blocks advancement, *Ortiz-Diaz*, 867 F.3d at 74—all fall within *Brown*'s "heartland," *id.*; *see* 110 Cong. Rec. 7242 (1964) (Statement of Sen. Case) (Title VII provides a remedy for practices that "limit … opportunities … and restrict … employment advance[ment], underutilize … professional skills, [and] deprive [employees] of job security").

Likewise, if plaintiffs show an objective disadvantage yielding "stratification," *White*, 548 U.S. at 63, they may sue. Hence, *Brown* permits suits based on transfers to "undesirable" or "inconvenien[t]" shifts, *Freedman*, 255 F.3d at 844; *Ginger*, 527 F.3d at 1344, or that leave the plaintiff with her "skills and education" not "fully utilized," *Pardo-Kronemann*, 601 F.3d at 607, performing "work well below her grade level," *Holcomb*, 433 F.3d at 902, or overseeing a smaller budget,

*Czekalski*, 475 F.3d at 365. Chambers' assertion that *Brown* limits Title VII to "economic" or "quantifiable" harms, Chambers Br. 25, 33-34, thus bears no relation to this Court's *actual* caselaw, which recognizes that "adverse employment actions extend beyond readily quantifiable losses." *Russell*, 257 F.3d at 818.[7]

B. But like *Meritor*, *Harris*, and *White*, *Brown* accommodates the purposes on the other side of the balance as well—by turning aside a few suits based on "[p]urely subjective injuries," *Forkkio*, 306 F.3d at 1130, and "conclusory assertions," *Russell*, 257 F.3d at 818.

In doing so, *Brown* appropriately recognizes, first, that infinite liability does not further Title VII's discrimination-fighting purpose. If "every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like … form[ed] the basis of a discrimination suit," then courts and the EEOC—"already staggering under an avalanche of filings"—would "be crushed, and serious complaints would be lost among

---

[7] These cases also show the error in Chambers' claim that *Brown* is inconsistent with Supreme Court decisions recognizing that "Title VII is not limited to 'economic' or 'tangible' discrimination." Chambers Br. 25 (quoting *Meritor*, 477 U.S. at 64). *Brown* imposes no limit that conflicts with these decisions. When *Brown* speaks of "objectively tangible harm," 199 F.3d at 457, it is best read to require material, objective harm.

the trivial." *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (Posner, J.).   That is why the Supreme Court has deemed it "important to separate significant from trivial harms." *White*, 548 U.S. at 68.   And that is what *Brown* does.   While *Brown* is not demanding, *supra* 9-10, it requires some material harm before courts step in.[8]

Second, *Brown* avoids making liability turn on subjective, idiosyncratic preferences.   As *White* explained (in the context of Title VII's anti-retaliation provision), "we believe the … standard for judging harm must be objective" because "[a]n objective standard is judicially administrable" and "avoids the uncertainties and unfair discrepancies" a "subjective" standard yields.   548 U.S. at 68.   That preference for objective standards is why the Court "has emphasized the need for objective standards in other Title VII contexts," *id.* (citing *Harris* and *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)), which likewise supports

---

[8] Chambers cites legislative history purporting to show that Congress believed that "prohibiting discrimination based only on 'five forbidden criteria …' was generally sufficient to limit" overbreadth.   Chambers Br. 26.   This discussion, however, addressed concerns that Title VII would prohibit employers from imposing work-related "qualifications."   GPO Legislative History 3015.   It did not address whether employees must show material harm.

*Brown*'s requirement of objective harm.  Employers' liability should not turn on whether employees prefer one position over an objectively identical position.  *E.g.*, *Currier*, 304 F.3d at 88-89 (no claim based on transfer from one "do nothing position" to another).

Third, *Brown* appropriately recognizes that Title VII guards against excessive interference in the workplace.  "Title VII could not have been enacted into law without substantial support from legislators … who traditionally resisted federal regulation of private business," and who "demanded as a price for their support that 'management prerogatives, and union freedoms … be left undisturbed to the greatest extent possible.'" *Weber*, 443 U.S. at 206-07; *accord* 110 Cong. Rec. 1662 (1964) (Additional views of Rep. McCulloch et al.) ("Internal affairs of employers and labor organizations must not be interfered with except to the limited extent that correction is required in discrimination practices.").  Hence, Congress did not intend Title VII to authorize "judicial micromanagement of business practices," *Mungin v. Katten, Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C. Cir. 1997), to serve as "a general civility code for the … workplace," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998), or to reach "petty slights or minor

annoyances that often take place at work," *White*, 548 U.S. at 68.

As detailed below, the default American rule is that employers can alter (or decline to alter) employees' duties at will. *Infra* 50-51. *Brown*'s rule avoids unnecessarily "restructur[ing those] business practices," *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 (1978), by limiting suit to decisions that leave employees mired in materially worse positions. *Accord Threat*, 2021 WL 3140525, at *3 (materiality requirement "prevents the undefined word 'discrimination' from command[ing] judges to supervise the minutiae of personnel management").

### 3. The Contrary Arguments Lack Merit.

The contrary arguments of Chambers and others lack merit.

### i. Precedent Forecloses Chambers' Argument That Title VII Must Be Interpreted As Broadly As Its Text Might Permit.

Chambers and *amici* principally argue that Section 703(a)(1) can be interpreted broadly enough to reach "any differential treatment" and that this interpretation would in some respect further Title VII's anti-discrimination purpose. Chambers Br. 16; *see id.* at 20 (invoking broad characterizations of Title VII's purpose from *Trans World Airlines* and *McDonnell Douglas*); U.S. Br. 17 (similar from *Teamsters*). That argument fails for reasons *Amicus* has already explained: Title VII does

not pursue a single "purpose[] at all costs." *CTS Corp. v. Waldburger*, 573 U.S. 1, 12 (2014). And in suggesting otherwise, Chambers ignores not just *Harris*, *Meritor*, and *White*, but all the many ways in which Congress placed some conduct—even though discriminatory—outside Title VII, including discrimination by small employers, 42 U.S.C. § 2000e, and religious employers in many circumstances, *id.* § 2000e-1. Congress may have hoped that Title VII would help end discrimination in all forms. *Cf. Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71, 81 (1977). But as the Supreme Court has recognized, the statute Congress enacted did not provide a judicial remedy of such unlimited scope.

This same point also saps the force from the hypotheticals of Chambers and her *amici*. They trumpet that "[u]nder *Brown*, even brazen[ly] … transferring an employee … based explicitly on" a protected characteristic is not actionable absent material harm. U.S. Br. 17; *see* Chambers Br. 35-36. And while they cannot identify any real-world *examples* of employers declaring (for example) that they are denying a lateral transfer because an employee is Black, they observe that this result is theoretically possible. "Decades after Title VII's enactment," Chambers declares, "that cannot be right." Chambers Br. 36.

This is potent rhetoric.  The same, however, could be said of *Meritor* and *Harris*.  Under those decisions, supervisors can in theory declare that they harassed employees because of sex—but unless the harassment was "severe" or "pervasive," those decisions place it outside of Title VII.  The same could also be said of *White*, which in theory allows employers to retaliate, so long as it is not "material" or severe enough to dissuade a "reasonable" employee.  548 U.S. at 68.  Those decisions, like *Brown*, do not bless discriminatory conduct.  They merely hold that Title VII does not provide a *cause of action* absent material, objective injury.   If Chambers desires a different balance, Congress is her forum.[9]

Chambers and her *amici* have no answer to *Meritor*, *Harris*, and *White* (much less *Weber* and *Guerra*, which also reject the literalistic approach they champion).  They do not so much as mention the holding of *Harris* and *Meritor* requiring a "sufficient[]" and "objective[]" effect on

---

[9] Chambers (at 35) also invokes *Douglas v. Donovan*, 559 F.3d 549 (D.C. Cir. 2009).   The majority and dissent there, however, both applied *Brown*'s requirement of "objectively tangible harm."   *Compare id.* at 552 (majority), *with id.* at 557 (Tatel, J., dissenting).   They disagreed over whether the harm from losing the ability to compete for a highly competitive "award" was too "speculative."   *Compare id.* at 552 (majority), *with id.* at 557 (Tatel, J., dissenting).   That disagreement is separate from whether Section 703(a)(1) requires material, objective harm.

a term or condition of employment.  510 U.S. at 21.  As to *White*, Chambers distinguishes it on the ground that Title VII's anti-retaliation provision "reaches conduct *outside* of the workplace" and is not limited to discrimination in "terms, conditions, or privileges of employment." Chambers Br. 40; *see* U.S. Br. 22.  That distinction, however, does not help her:  *Even though* Title VII's anti-retaliation provision is broader than its anti-discrimination provision, the Court *still* required "material adversity."  That result cannot be squared with Chambers' theory:  If the word "discrimination" reaches "any differential treatment," Chambers Br. 16, then *White*—which places some retaliatory "discriminat[ion]" outside Title VII—could not stand.

In his panel concurrence, Judge Tatel distinguished *White* as striking a different balance that is "less burdensome for plaintiffs" in some ways but "more burdensome" in others, based on Section 704(a)'s different "objectives."  Panel Op. 5-6 (Tatel, J., concurring).  But to begin, that distinction again is completely atextual: If the phrase "discriminate against" in Section 704(a) requires material and objective harm, the same phrase in Section 703(a)(1) cannot mean something different.

42

More important, this distinction conflicts with Chambers' plain-text argument. Once one justifies (as Judge Tatel does) *White*'s standard based on a pragmatic weighing of statutory purposes, that is the end of Chambers' argument that her reading must prevail because the literal text commands it. True, Judge Tatel maintains that *Brown* weighed the statutory purposes *wrong*. Judge Tatel is, respectfully, incorrect, for reasons explained above. But the more important point is that once the debate narrows to which rule best balances Title VII's purposes, *stare decisis* becomes irresistible. Such arguments cannot provide the "special justification" required to overthrow decades-old statutory precedent.

### ii.    The *Ellerth* Arguments Are A Distraction.

*White* also shows why Chambers and others get nowhere focusing on *Ellerth*. Chambers Br. 40; U.S. Br. 7. *Brown* cited *Ellerth*'s requirement of a "tangible employment action" to support its rule. 199 F.3d at 456-57; *see Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998). And as Chambers and others observe, *White* subsequently emphasized that *Ellerth* "did not discuss the scope of" Title VII's "general antidiscrimination provision" but focused on when employers are "vicariously liable." 548 U.S. at 64-65.

That observation, however, does not help Chambers.  First, *White*'s clarification would have been no surprise to the *Brown* court, which recognized that *Ellerth* addressed "vicarious liability."   199 F.3d at 456-57.  And second, the skirmish over *Ellerth* is at most a debater's point— because *White* itself limits "discrimination" under Title VII to "objective" and "materially adverse" harms.  548 U.S. at 68.  That holding accords with *Brown* and is irreconcilable with Chambers' position.

### iii.    The District's Position Does Not Make Sense.

The District agrees that Section 703(a)(1) "incorporat[es] … a modest threshold of harm" and that such a threshold is not "necessarily atextual."  District. Br. 19.  The District thus rejects the central thrust of Chambers' argument.  Then, however, the District asserts that the harm from a transfer decision "is necessarily more than de minimis," rendering every lateral transfer actionable.  District. Br. 8.

This *ipse dixit* is unpersuasive.  If Section 703(a)(1)'s prohibition on "otherwise discriminat[ing]" *generally* requires a threshold showing of harm, *transfer* decisions cannot be different.  Many such decisions may indeed "alter[] a fundamental aspect of … employment" or "depriv[e]" the plaintiff "of opportunities."  District. Br. 8.  But not all.  In this area, like

many others, Title VII does not enact bright-line rules. Instead, it requires a "fact-intensive" inquiry. *Jeffries v. Barr*, 965 F.3d 843, 869 (D.C. Cir. 2020) (Pillard, J., concurring in part and dissenting in part).

> **B.    The Phrase "With Respect To … Compensation, Terms, Conditions, Or Privileges Of Employment" Does Not Help Chambers And Her *Amici*.**

These points suffice to show that *Brown* is correct. But the second half of Section 703(a)(1)—its prohibition on discrimination "with respect to … compensation, terms, conditions, or privileges of employment"—reinforces the conclusion. Chambers and her *amici* focus their briefs on this phrase. This phrase, they contend, "encompass[es] all attributes of the employer-employee relationship." Chambers Br. 17. And because they believe "the position itself" is one such attribute, they argue that every lateral transfer is actionable. U.S. Br. 13; *see* Chambers Br. 21. This argument, however, comprehensively fails. Instead, the second half of Section 703(a)(1) confirms that Chambers and her *amici* are wrong.

> **1.    The Phrase "With Respect To" Makes Clear That A Plaintiff Must Suffer A Harmful Change To A Term, Condition, Or Privilege Of Employment.**

Chambers and her *amici* focus on the phrase "terms, conditions, or privileges of employment." But they say little about the words that precede it: "discriminate against … *with respect to*." Those words,

45

however, are critical. "[With] respect to" means "with reference to" or "in relation to." Respect, *Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/with%20respect%20to (last visited Aug. 26, 2021). And in Title VII, as explained, to "discriminate against" means to "treat[] … individuals worse," *Bostock*, 140 S. Ct. at 1740, in a manner "that injure[s]," *White*, 548 U.S. at 59. So to discriminate against "with respect to" terms, conditions, or privileges means to impose *worse* terms, conditions, or privileges and to *injure* by doing so. Hence, "[t]he critical issue, Title VII's text indicates, is whether members of one [protected group] are exposed to *disadvantageous* terms or conditions." *Oncale*, 523 U.S. at 80 (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)). So even if Chambers and *amici* were right about the meaning of "terms, conditions, or privileges," *Brown* would still correctly require lateral-transfer plaintiffs to show material, objective harm.

2.  The Phrase "Terms, Conditions, Or Privileges Of Employment" Does Not Encompass Purely Lateral Transfer Decisions.

Regardless, Chambers and her *amici* are wrong about the phrase "terms, conditions, or privileges of employment." This phrase does not "encompass all attributes of the employer-employee relationship."

46

Chambers Br. 17. And in particular, a purely lateral transfer, without more, does not impose a change in terms, conditions, or privileges of employment within the meaning of Title VII. That is so for four reasons.

1. *First*, Chambers' reading depends on a meaning of the phrase "terms, conditions, or privileges" that conflicts with Section 703(a)(1) and the Supreme Court's cases interpreting it. Chambers notes that "condition" (like "term") can mean "something established or agreed upon as a requisite to the doing or taking effect of something else." Chambers Br. 18 (quoting Condition, *Webster's Third Dictionary* 473 (1961)). Based on this meaning, Chambers avers that an employee's position and duties are among the "requirements" of the job that, if modified, constitute a change in terms and conditions. Chambers Br. 22.

That, however, is not the meaning this phrase carries in Section 703(a)(1). The word "conditions" has "two common meanings," the other of which is "attendant circumstances." *Fort Stewart Sch. v. Fed. Lab. Rels. Auth.*, 495 U.S. 641, 645 (1990). The term-of-art phrase "terms and conditions of employment" likewise naturally refers to the "'incidents of employment'"—*i.e.*, the circumstances in which employees work, such as their work environment, work rules, benefits, and similar. *Hishon v.*

*King & Spalding*, 467 U.S. 69, 74 (1984); *cf. Roget's International Thesaurus*, ¶ 507.2 (4th ed. 1977) (identifying "conditions" and "terms" as synonyms). And the Supreme Court has interpreted the phrase "terms, conditions, or privileges" in Section 703(a)(1) to mean those sorts of "incidents of employment." *Hishon*, 467 U.S. at 74; *cf. Fort Stewart*, 495 U.S. at 645 (observing that the phrase "wages, hours, and other terms and conditions of employment" in the NLRA "does (perhaps) … refer only to physical circumstances of employment"). An employee's job duties are not an "incident[] of employment." *Hishon*, 467 U.S. at 74. The United States' refrain that "it is difficult to imagine a more fundamental 'term[]' or 'condition' of employment than *the position itself*," U.S. Br. 13, is a nice turn of phrase but does not match how the Supreme Court has interpreted Section 703(a)(1).

In fact, in Section 703(a)(1), the phrase "[t]erms, conditions, and privileges" *cannot* carry Chambers' boundless meaning of "all attributes of the employer-employee relationship." Chambers Br. 17. If it did, much of Section 703(a)(1) would become incoherent. Compensation is an "attribute" of this relationship, but Section 703(a)(1) enumerates "compensation" separately. Chambers' reading renders this word

superfluous, contravening the "cardinal principle" that "a statute ought … to be so construed that … no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Section 703(a)(1) also separately prohibits "fail[ing] or refus[ing] to hire" and "discharg[ing]" based on a protected characteristic. But one "attribute[] of the employer-employee relationship," Chambers Br. 17, is whether the plaintiff has a job *at all*. On Chambers' reading, Section 703(a)(1)'s prohibitions on discriminatory hiring and firing are also superfluous. *Accord Hishon*, 467 U.S. at 74 (recognizing that Title VII only "govern[s] certain aspects of th[e] [employment] relationship").

One of Chambers' own sources underscores the point. She cites a prominent anti-discrimination pledge in which unions agreed to write into "all collective bargaining contracts nondiscrimination clauses covering hire, tenure, terms, conditions of employment, work assignment and advancement." *See* President's Committee on Equal Employment Opportunity, *Report to the President* 122 (Nov. 26, 1963). Chambers believes that this passage shows that the phrase "terms, conditions, or privileges" includes work assignments and job duties. Chambers Br. 31-32. It shows the opposite: The unions who drafted that pledge believed

they needed to enumerate "work assignments" *separately* from "terms" and "conditions of employment."

2. *Second*, even were Chambers right that Section 703(a)(1) encompasses everything "established or agreed upon as a requisite to the doing" of a job, it would not reach purely lateral transfers affecting work assignments or supervisors. That is because, in most U.S. workplaces, the relevant "agreed upon … requisite" does not lock in particular work assignments or supervisors. Rather, employees may be required to perform different assignments under different supervisors (or to maintain the same assignments and same supervisors) as part of their jobs. Hence, employees who receive lateral transfers (or who do not receive desired transfers) have not incurred any change, much less any "disadvantag[e]," in terms, conditions, or privileges of employment. *Oncale*, 523 U.S. at 80.

This Court has repeatedly recognized this point. When *Brown* concluded that the plaintiff had not suffered actionable discrimination, it emphasized that "it was the Bank's policy to require all senior practitioners to make themselves available for reassignment as required by the Bank's shifting needs" and that the Bank "routinely re-assigned

employees within its organization as a common business practice." 199 F.3d at 449-51. And when the Court reached the same result in *Jones v. D.C. Department of Corrections*, 429 F.3d 276 (D.C. Cir. 2005), it emphasized that "the tower [to which the plaintiff was transferred] was one of the three possible assignments that might arise in the ordinary course of her employment." *Id.* at 281. Hence, *Jones* explained that "there was no 'material' change in 'the terms, conditions, or privileges of her employment'" and that "[n]either a routine shift change nor a routine reassignment that was part of a probationary employee's ordinary training can be deemed an adverse employment action." *Id.*

The same is true here. As in most U.S. workplaces, Chambers' employment remained at all times subject to the same terms, conditions, and privileges—which contemplated that Chambers might be required either to perform different assignments, or to continue performing the same assignments, as part of her work in the Attorney General's office.

3. *Third*, law under the National Labor Relations Act ("NRLA")—which Chambers invokes—undercuts her position and supports *Brown*. Under the NLRA, the Supreme Court has held that the phrase "wages, hours, and other terms and conditions of employment" defines "a limited

category of issues subject to compulsory bargaining." *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 220-21 (1964). And it has emphasized that this phrase does not reach the "extreme" of including "any subject which is insisted upon as a prerequisite for continued employment." *Id.* at 221. That is the opposite of Chambers' position, which reads Title VII to reach anything "agreed upon as a requisite to" an employment relationship. Chambers Br. 18.

Chambers' NLRA-based arguments lack merit. She avers that the NLRA reaches even "comparatively slight" changes to terms and conditions of employment and suggests that *Microimage Display Div. of Xidex Corp. v. NLRB*, 924 F.2d 245, 252 (D.C. Cir. 1991), held that lateral transfers are actionable under the NLRA. Chambers Br. 29. But to begin, if NLRA decisions have relevance, the only decisions that matter are those that issued before 1964, when Congress passed Title VII. *Fibreboard*'s "limited" interpretation of the phrase "wages, hours, and other terms and conditions" preceded Title VII. None of Chambers' decisions did. Chambers Br. 28-29.

Moreover, the post-1964 decisions interpreting the NLRA turn on the "considerable deference" due to the National Labor Relations Board.

*Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 307 (D.C. Cir. 2003). Courts uphold the Board's interpretations so long as "reasonably defensible." *Id.* By contrast, the EEOC's guidance (which Chambers invokes) receives no similar deference. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111 n.6 (2002).[10] Courts also weigh Board interpretations in light of the NLRA's "unique purpose" of "preserv[ing] the balance of power between labor and management"—which is "inapposite in the context of Title VII." *Vance v. Ball State Univ.*, 570 U.S. 421, 434 n.7 (2013).

*Microimage* was that type of deference case. It accorded a "wide measure of discretion" to the Board's judgment on "where to draw the line of matters trivial in their impact." 924 F.2d at 252. *Microimage* held that the Board had reasonably determined that the transfer there "significantly curtailed [the plaintiff's] contact with other employees" and so violated the NLRA. *Id.* Nothing about *Microimage* supports

---

[10] Indeed, neither of Chambers' dated EEOC decisions help her. One concerned the Rehabilitation Act, not Title VII, and involved a transfer to the "night shift" that likely would be actionable under *Brown*. *Lehmann v. Frank*, EEOC DOC 01860673, 1989 WL 1008741, at *4 (Feb. 22, 1989); *supra* 9. The other involved a schedule change, which Chambers does not claim occurred in her case. *Weaver v. Frank*, EEOC DOC 01883168, 1988 WL 920346, at *1 (Nov. 16, 1988).

Chambers' claim that Congress understood that Title VII would reach lateral transfer decisions inflicting no material harm. If anything, *Microimage*'s observation that the Board has "discretion" to exclude "matters trivial in their impact," *id.*, undercuts Chambers' argument that Title VII *unambiguously* reaches even trivial harms.

4. *Fourth*, Chambers and her *amici* cannot gain by citing decisions stating that the phrase "terms, conditions, or privileges of employment" is "not limited to 'economic'" discrimination and "'strike[s] at the entire spectrum' of prohibited disparate treatment." U.S. Br. 15 (quoting *Meritor*, 477 U.S. at 64); *see* Chambers Br. 20. Again, *Brown* does not limit Section 703(a)(1) to economic discrimination. Nor does it place any portion of the "spectrum" of discrimination outside of Title VII. Instead, like *Meritor*, *Harris*, and *White*, *Brown* holds that transfers are actionable when they inflict material, objective harm. *See Holcomb*, 433 F.3d at 902 ("we do not categorically reject a particular personnel action as nonadverse simply because it does not fall into a cognizable type").

## C.    Legislative History Does Not Support Chambers.

Given how clearly text and precedent support *Brown*, the Court need not delve into legislative history. Indeed, neither Chambers nor the

United States seriously claims that legislative history compels their position. Correctly so: The "discrimination provisions remained essentially the same" during Congress's consideration of Title VII, EEOC, U.S. GPO, *Legislative History of Titles VII and XI of Civil Rights Act of 1964*, 1005 (1964), and the limited relevant history supports *Brown*. *Supra* 28 n.5, 34-39. The Constitutional Accountability Center, however, cites legislative history it claims shows that Congress understood that Title VII would cover "transfer" decisions. CAC Br. 16 (quoting S. Rep. No. 88-867, at 24 (1964)).

That claim, if true, would be a red herring: *Brown*'s rule, as explained, does not exclude transfers. It simply requires material, objective harm. And in fact, Chambers and the United States had good reason not to invoke this history: It concerns an unenacted bill whose anti-discrimination provision the Department of Justice identified as "generally broader in scope" than Title VII's, 110 Cong. Rec. 12597 (1964), and that was eventually "doomed by conservative opposition," Ahmed A. White, *My Coworker, My Enemy: Solidarity, Workplace Control, and the Class Politics of Title VII*, 63 Buff. L. Rev. 1061, 1104-05 (2015).

Meanwhile, if that bill *did* inform Title VII's interpretation, it would only undermine Chambers' position: Its core anti-discrimination provision prohibited denials of "equal employment opportunity" based on protected characteristics—and it defined that prohibition based on whether a practice "results or tends to result in *material disadvantage or impediment* to any individual in obtaining employment or the incidents of employment." S. Rep. No. 88-867, at 24 (1964) (emphasis added). That is a nearly verbatim statement of *Brown*'s rule. It would be passing strange if Title VII's anti-discrimination provision swept more broadly than this unenacted bill, which Congress rejected as *too broad*.

The Constitutional Accountability Center fares no better with its reliance on floor statements by individual legislators averring that Title VII would cover "transfer[s]" and "assignment[s]." CAC Br. 16-17. Again, *Brown* does not exclude transfers from Title VII. And regardless, "floor statements by individual legislators rank among the least illuminating forms of legislative history," *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017), and particularly here: These statements come from Title VII's *opponents*, who also claimed (on the same page) that Title VII "would compel employers to hire members of certain minority groups" based on

"percentage[s] … in the community," 110 Cong. Rec. 7778 (1964) (Statement of Sen. Tower).

### D. The History Of Congressional Action Does Not Support Chambers.

Chambers also invokes "Congressional action in the decades since Title VII[]"—and in particular, the 1991 amendments, which authorized compensatory damages even absent "a discharge or a loss of pay." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 254 (1994); *see* Chambers Br. 31. Per Chambers, these amendments "make clear" that plaintiffs may sue "even when they do not suffer … objectively tangible harm." Chambers Br. 34.

That argument, however, is a nonsequitur that mischaracterizes *Brown*. *Brown*, again, allows suit in many circumstances not involving discharge or loss of pay. And the 1991 amendments simply made clear that employees may recover for non-wage harms. They do not show that Congress authorized suit by employees with *no* material harm.

Nor does Congress's abrogation of *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), *superseded by statute as stated in Landgraf*, 511 U.S. 244, show that Congress intended to allow suits based on lateral transfers yielding no material harm. *Patterson* held that 42 U.S.C.

57

§ 1981 "prohibits discrimination only in the making and enforcement of contracts" and does not reach "postformation conduct." 491 U.S. at 176. Congress in 1991 amended § 1981 to reject this formation/post-formation distinction. *E.g.*, H.R. Rep. No. 102-40(I), 90-91 (1991), *as reprinted in* 1991 U.S.C.C.A.N. 549, 628-29.

Chambers tries to wrench support from *Patterson* by observing that the alleged discrimination there included giving the plaintiff "tasks [like] sweeping and dusting" and arguing that *Patterson* contemplated that such conduct would be actionable under Title VII. 491 U.S. at 176. *Patterson*, however, also involved core pecuniary harms like "denied wage increases," as well as other "forms of racial harassment" and denial of "training for higher level jobs." *Id.* Neither *Patterson* nor Congress dwelt on whether changes to "tasks"—standing alone, and without material harm—are actionable under Title VII.[11]

---

[11] Chambers observes that the Fifth Circuit enjoined a "no-transfer" policy in *Bing v. Roadway Exp., Inc.*, 485 F.2d 441, 450 (5th Cir. 1973). The Fifth Circuit, however, found a Title VII violation because the policy operated to "relegate[] [Blacks] to the *lower paying, lower status* job of city driver." *Bing v. Roadway Exp., Inc.*, 444 F.2d 687, 690 (5th Cir. 1971) (emphasis added).

### E.    Chambers' Administrability Arguments Are Meritless

Last, Chambers and others aver that *Brown*'s rule creates "administrability challenges" and "pernicious effects." Chambers Br. 42; Metro. Wash. Employment Br. 10. These arguments lack merit.

As *Amicus* has explained, the law often imposes materiality requirements. *Supra* 29. Chambers and her *amici* make no real effort to show that this Court or D.C. district courts have found *Brown* uniquely intractable. Given how long *Brown* has governed, that is itself telling. Certainly, Chambers does not show that *Brown*'s rule is knottier than the similar threshold inquiries approved in *Meritor*, *Harris*, and *White*, which is the relevant comparison.

True, Chambers' position would avoid the need to undertake that threshold injury. But only at a *cost*. Cases would proceed to summary judgment and trial even though the plaintiff never identified material harm justifying judicial intervention. Courts and juries would need to undertake difficult inquiries into (for example) the employer's subjective intent instead of resolving cases on the comparatively straightforward ground that the employee incurred no material harm. Those costs help

explain why *Meritor*, *Harris*, and *White* did not endorse Chambers' rule of blanket liability.  The result should be no different here.

Chambers and others also focus much fire on how the Seventh Circuit wrote its 1989 opinion in *Spring v. Sheboygan Area School District*, 865 F.2d 883 (7th Cir. 1989).  That case held that a school principal could not ground an ADEA claim on her transfer from one school district to another because her pay increased and she incurred no objective harm.  *Id.* at 886.  The Seventh Circuit also observed that the new school was more affluent and did not require the principal to (for example) manage "program[s] for emotionally disturbed children."  *Id.* Chambers and her *amici* fault this observation, emphasizing that "many principals may prefer to lead more diverse institutions."  Chambers Br. 43; *see* Metro. Wash. Employment Br. 10-11.

Chambers and her *amici* are doubtless correct that many people value diverse institutions.  This observation, however, misses the point. Under *Brown*, courts need not weigh which positions one employee or another may "prefer."  They weigh only whether a transfer decision inflicted material, objective harm.  If the *Spring* plaintiff had shown that the transfer made her objectively worse off—for example, because the

district's leadership weighted experience leading diverse institutions in making promotion decisions—*Brown* would allow her to sue.  *Supra* 35.

## III.  The Court At Minimum Should Retain *Brown* In *McDonnell Douglas* Cases.

Even if the *en banc* Court holds that Section 703(a)(1) does not always require material, objective harm, *Amicus* respectfully suggests that the Court consider retaining *Brown* in cases where plaintiffs lack direct evidence of discrimination and rely on *McDonnell Douglas*. *McDonnell Douglas* expressly requires an "adverse employment action" as part of plaintiffs' prima facie case.  *Walker*, 798 F.3d at 1091.  And it does so as part of a structured inference: When established, the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."  *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981).  If a lateral transfer decision inflicts no material harm, however, it contributes nothing to this inference. Hence, one scholar who has criticized *Brown*'s rule in general has urged retaining it in *McDonnell Douglas* cases.  Rebecca Hanner White*, De Minimis Discrimination*, 47 Emory L.J. 1121, 1177 (1998); *cf.* Chambers

Br. 16-17 (recognizing that the existence, or not, of harm from a transfer is relevant to whether discrimination should be inferred).

## IV. The Court Should Not Address Chambers' Anti-Retaliation Arguments.

The *en banc* Court should not entertain Chambers' request to revive her claim under Section 704(a). Chambers Br. 45-50. Before the district court and the panel, Chambers pressed two arguments—one based on Section 703(a)(1)'s anti-discrimination provision, and one based on Section 704(a)'s anti-retaliation provision. Panel Op. 6-8. The *en banc* Court, however, limited its order setting the case for rehearing to the first issue. It specified that the "parties are directed to limit briefing to the question of whether the court should retain the rule that the denial or forced acceptance of a job transfer is actionable under Title VII, 42 U.S.C. 2000e-2(a)(1), only if there is 'objectively tangible harm,' *Brown v. Brody*, 199 F.3d 457 (D.C. Cir. 1999)." Order 2. And it imposed the same limitation on the "proposition" that "Appointed amicus curiae is directed to defend." *Id. Amicus* thus does not address the retaliation arguments.

## CONCLUSION

The *en banc* Court should decline to overrule *Brown*.


DATED:  August 27, 2021          /s/ Zachary C. Schauf
                                 Zachary C. Schauf
                                 Laurel A. Raymond
                                 JENNER & BLOCK LLP
                                 1099 New York Avenue, NW
                                 Suite 900
                                 Washington, DC 20001-4412
                                 Phone: (202) 639-6000
                                 Fax: (202) 639-6066
                                 zschauf@jenner.com

                                 *Court-Appointed Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,446 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, Century 14-point.

Dated: August 27, 2021

/s/ Zachary C. Schauf
Zachary C. Schauf

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 27, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. I certify that Defendants-Appellees are registered CM/ECF users and that service to Defendants-Appellees will be accomplished by the CM/ECF system.


/s/ Zachary C. Schauf
Zachary C. Schauf